```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3     UNITED STATES OF AMERICA,

4             Plaintiff,

5      v                                 No. 12-cr-20272

6

7      D-3   ABDUL MALIK AL-JUMAIL
       D-4   FELICAR WILLIAMS
8      D-6   JAMELLA AL-JUMAIL
       D-10  CAREY VIGOR

9             Defendants.
       _____/
10

11                          JURY TRIAL

12            BEFORE THE HONORABLE DENISE PAGE HOOD
                 UNITED STATES DISTRICT JUDGE
13          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
14                     Detroit, Michigan
                  Tuesday, August 12, 2014
15
      APPEARANCES:
16

17     For the Plaintiff:      PATRICK J. HURFORD
                               U.S. Department of Justice
18                             Criminal Division, Fraud Section
                               211 W. Fort Street, Suite 2001
19                             Detroit, Michigan  48226
                               (313) 226-9553
20
                               BROOKE HARPER
21                             U.S. Department of Justice
                               Northern District of Illinois
22                             291 South Dearborn Street
                               Fifth Floor
23                             Chicago, Illinois 60604

24

25
```

```
 1        APPEARANCES:
 2       (Continued)

 3       For the Plaintiff:       CHRISTOPHER CESTARO
                                  U.S. Department of Justice
 4                                Health Care Fraud Unit
                                  Fraud Section, Criminal Division
 5                                1400 New York Avenue, N.W.
                                  Washington, D.C.  20005
 6                                (202 353-7901

 7       For the Defendant        NABIH H. AYAD
         Abdul Malik              Ayad Law, PLLC
 8       Al-Jumail:               645 Griswold Street. Suite 2202
                                  Detroit, Michigan  48226
 9                                (313) 983-4600

10       For the Defendant        STEPHON E. JOHNSON
         Felicar Williams:        615 Griswold, Suite 215
11                                Detroit, Michigan 48226
                                  (313) 502-5962
12
         For the Defendant        MARIA P. MANNARINO
13       Jamella Al-Jumail:       431 Gratiot Avenue
                                  Detroit, Michigan  48226
14                                (313) 761-7347

15       For the Defendant        PAUL C. LOUISELL
         Carey Vigor:             Musilli Brennan Associates, PLLC
16                                24001 Greater Mack
                                  St. Clair Shores, Michigan  48080
17                                (586) 778-0900

18
         Reported by:             Merilyn J. Jones, RPR, CSR
19                                Official Federal Court Reporter
                                  merilyn_jones@mied.uscourts.gov
20

21

22

23

24

25
```

```
TABLE OF CONTENTS
```

**WITNESSES:  PLAINTIFF**                                    **PAGE**
CHRISTOPHER ELVERSON
     Direct examination by Mr. Hurford          11
     Cross-examination by Mr. Ayad             13
     Cross-examination by Mr. Louisell         35
     Redirect examination by Mr. Hurford       40
     Recross-examination by Mr. Ayad           42


**WITNESSES:  DEFENDANT**
None


**EXHIBITS:**                Identified              Received
None

1           Detroit, Michigan

2           Tuesday, August 12, 2014 - 1:23 p.m.

3           THE CLERK: All rise.  The United States District

4    Court for the Eastern District of Michigan is now in session

5    The Honorable Denise Page Hood presiding.

6           You may be seated.

7           Calling Case Number 1220272, United States versus

8    Abdul Malik Al-Jumail, Felicar Williams, Jamella Al-Jumail and

9    Dr. Carey Vigor.

10          Counsel, identify yourselves for the record.

11          THE COURT:  I'm doing that again because I have a

12   new court reporter.  Okay.

13          MR. HURFORD: Patrick Hurford, Brooke Harper, Chris

14   Cestaro appearing of behalf of the United States.  Also seated

15   at counsel table is Mark Williams, paralegal with the

16   Department of Justice, as well as, Special Agent Michael

17   Fairbanks and Mark Krieg.

18          MR. AYAD: Good afternoon, judge.  Attorney Nabih

19   Ayad on behalf of Mr. Tony Al-Jumail standing directly to my

20   left.

21          MR. JOHNSON: Good afternoon, your Honor.  Stephon

22   Johnson on behalf of Ms. Felicar Williams, who is present to my

23   right.

24          MS. MANNARINO: And good afternoon.  Maria

25   Mannarino on behalf of Jamella Al-Jumail, who is present and

1    standing to my left.

2            MR. LOUISELL: Good afternoon, your Honor.  Paul

3    Louisell appearing on behalf of Dr. Carey Vigor who is standing

4    to my left.

5            THE COURT:  Okay.  Very good.  As you all should

6    know, I have asked Ms. Daniel to check the record so I can see

7    how many times that this was, "counter terrorism unit" was said

8    and so the record will ultimately reflect that accurately as

9    taken by her, I'm sure you all will agree, that Mr. Hurford

10   asked Agent Elverson what his specialty, what he did, and his

11   answer was that he was a special agent for the FBI.  He asked

12   how long.  He said, four years.  He was asked about his

13   assignment, where he said he was in the counter terrorism, I

14   don't remember if she told me unit, or whatever.  Then he later

15   asked him did he also have any other assignment and he began by

16   saying, "aside from counter terrorism unit", where there was an

17   objection, and then after I said we would not take it up at

18   sidebar he repeated his full question saying again, "aside from

19   counter terrorism unit".

20           So I think there were three times.

21           Do you think more than that, Ms. Mannarino?

22           MS. MANNARINO: I know I heard more than once.  I

23   can't accurately pinpoint how many.  So I appreciate the court

24   asking the court reporter to check on that.

25           THE COURT:  Okay.  Very well.

1          THE COURT:  I don't know whether it will call more

2     attention to it if we repeat it again or not.  I think Mr.

3     Hurford has agreed to clear it up.

4          And are you all satisfied with how he will do

5     that?

6          MS. MANNARINO: I believe Mr. Hurford has

7     determined not to clear it up and to leave it to us to clear it

8     up if we so desire.

9          THE COURT:   That's fine.

10         Would you like me to clear it up?  I mean, I think

11    that it's clear from the testimony that he was not acting in

12    his present counter terrorism unit in investigating them, but

13    he was assigned to the arrest team because of some evidence

14    response training that he has, it appears.

15         But if you'd like me to clear it up, I'm happy to

16    do that.

17         MR. AYAD: My preference would be for the

18    government to clear it up because they are the most credible

19    about this particular questioning.

20         Number two, if that's not the case, I prefer that

21    I ask him a question on that and that if your Honor would

22    follow with basically reaffirming that position, I would

23    appreciate that, judge, because it is important.

24         THE COURT:   No, I'll either clear it now, I can

25    clear it up.  I will be happy to say that this is not a counter

1    terrorism unit investigation.

2              Is that correct, Mr. Hurford.

3              MR. HURFORD: That's correct, your Honor.

4              THE COURT:   Okay.

5              And that his assignment to this arrest team did

6    not have anything to do with the unit he is in.

7              MR. AYAD: That would be fine, judge.  I just

8    wanted a little more elaboration.  Thank you.

9              THE COURT:  Very good.

10             Do you have objection to that?

11             MR. HURFORD: Absolutely, not.  I would ask, ask

12   that witness confirm that those are the correct answers because

13   I actually never talked to him about whether --

14             THE COURT:   Well, he's under oath.

15             MR. HURFORD: I know.

16             THE COURT:   I assume he gave the correct answer

17   about where his assignment is, right?

18             MR. HURFORD: Correct.  I just -- he might want to

19   confirm the questions you're about to ask before we bring the

20   jury in.  I'm just trying to be safe.

21             THE COURT: So, you don't know the answer as to

22   whether or not he was assigned there for some other reason than

23   being on the arrest.

24             MR. HURFORD: I think that's the only reason he was

25   assigned there, your Honor.  I never specifically asked him

1    that question.

2                THE COURT:   Okay.

3                You're still under oath?

4                Yes?

5                THE WITNESS:   Yes, your Honor.

6                THE COURT:  Agent Elverson, is that right?

7                THE WITNESS:   Yes, your Honor.

8                THE COURT: Is the name of your unit the counter

9    terrorism unit?

10               THE WITNESS:   Yes.

11               THE COURT:   Counter terrorism?

12               THE WITNESS:   Correct.

13               THE COURT:   And you were assigned to this arrest

14   team; is that right?

15               THE WITNESS:   That is correct.

16               THE COURT:   And were you assigned there because

17   you're part of the counter terrorism unit?

18               THE WITNESS:   No.

19               THE COURT:   Okay.  And you were just assigned

20   there because of your evidence skills?

21               THE WITNESS:   More so just that they needed

22   someone there.  I was there, your Honor.

23               THE COURT:   A warm body in the right place?

24               THE WITNESS:   Correct.

25               THE COURT:   And so, to your knowledge there

1   wasn't anything related to counter terrorism in this arrest?

2              THE WITNESS:   No, your Honor.

3              THE COURT:   Do you speak any languages other than

4   English?

5              THE WITNESS:   No, I do not.

6              THE COURT:   So now we know that he's not assigned

7   there because of anything having to do with the counter

8   terrorism unit and he's not assigned there because of any

9   special language skills; is that fair?

10             MR. AYAD: That's fair, judge.

11             Again, so long as your Honor asks that -- what you

12   stated.

13             THE COURT:   I'm not going to promise I'm going to

14   say it verbatim, Mr. Ayad.  If you object to how I say it, you

15   are welcome to do so.

16             MR. AYAD: You're the judge.  I'm not going to

17   challenge it.

18             THE COURT:   Ms. Mannarino?

19             MS. MANNARINO: I have nothing further.  Thank you.

20             THE COURT:   Mr. Hurford.

21             MR. HURFORD: Nothing, your Honor.

22             THE COURT:   All right.  Let's bring out the jury.

23             And I don't expect this will come up, this unit,

24   anymore during his examination, right?

25             MR. HURFORD: I don't either.

```
 1              THE COURT:   Unless the defense wants to ask it at
 2   their own peril.
 3              MR. AYAD: I'm sorry.  What was the question?
 4              THE COURT:   I don't expect the counter terrorism
 5   unit to come up again by the government or the defendants, but
 6   if the defendants bring it up, it's at your own peril.
 7              MR. AYAD: That's correct, your Honor.  Thank you.
 8              THE COURT:   Okay.
 9         (At 1:30 p.m. jury present)
10              THE COURT:   You may all be seated.
11              I'm satisfied the jury is present in their proper
12   seats, what about counsel?
13              MR. HURFORD: Yes, your Honor.
14              MR. JOHNSON: Yes, your Honor.
15              MR. AYAD: So satisfied.
16              MS. MANNARINO: So satisfied.
17              MR. JOHNSON: Satisfied, your Honor.
18              THE COURT:  Thank you for taking a shorter lunch
19   than usual and I just want to advise you something.  The
20   witness on the stand, Agent Elverson, I am sure I'm going to
21   get that wrong again, indicated that he was a part of a counter
22   terrorism unit in his regular assignment.
23              The counter terrorism unit has nothing to do with
24   the investigation of this alleged health care fraud.  All
25   right.  And so he is not assigned there for any purpose related
```

1    to his usual unit.  He's just assigned there as part of the

2    arrest team.  All right.

3                   THE JURY PANEL:  Okay.

4                   THE COURT:   That's satisfactory, everyone?

5                   MR. HURFORD: Yes, your Honor.

6                   MR. AYAD: Yes, your Honor.

7                   MS. MANNARINO: Thank you.  No objection.

8                   THE COURT:   Okay.  Very well.

9                   You may proceed.  Mr., Agent Elverson is under

10   oath.

11                  THE WITNESS:   Yes, your Honor.

12                  C H R I S T O P H E R   E L V E R S O N,

13   called by the Government, previously sworn, testified as

14   follows:

15                     DIRECT EXAMINATION(continuing)

16   BY MR. HURFORD:

17   Q.  Agent Elverson, before we took a break I asked you about

18   whether Mr. Al-Jumail told you he paid the community liaisons.

19   Did you ask him how much he paid the liaisons?

20   A.  I did.  He stated they were paid several hundred dollars

21   for each patient.

22   Q.  And you stated on, before the break you stated about the

23   payment, you talked about the payment and eligibility checks.

24   Did you ask what happened after eligibility checks were

25   performed?

1    A.   Yes.  So once it was determined that the patient was not

2    being seen by another home health care company and that the

3    patient was billable, their insurance was billable by

4    Associates, Associates would send a nurse to visit the patient

5    and complete an initial form.  Upon completion of that form a

6    treatment plan would be established which generally involved

7    either a nurse or some other kind of therapist seeing a patient

8    one to two times per week.

9    Q.   And did he say how long that went on for?

10   A.   Yes.  So he stated that that would go on for no more than

11   two episodes under one health care company such as Associates.

12   At the end of two episodes -- the reason it wouldn't go pass

13   two episodes is because it may look suspicious to law

14   enforcement or medicare and that, so at the end of two

15   episodes, they would transfer the patient to Swift or if the

16   patient had already been seen at Swift, they would transfer

17   them back to Associates and they might do that multiple times.

18   Q.   And did you ask how long an episode was?

19   A.   Yes.  An episode, he said, was 60 days.

20   Q.   And between, between episodes, the 60-day period, did you

21   ask about recertifications?

22   A.   I did.  So he explained that at the end of an episode, or

23   60 days, a patient was required to be recertified by a doctor

24   and one doctor that he mentioned that commonly did

25   recertification for their parents was a female doctor by the

1   name of Sharma.

2   Q.  Did you ask whether Mr., did you ask Mr. Al-Jumail whether

3   he paid the liaison if one of their patients was recertified?

4   A.  Yes.  So, ever time a patient was recertified the liaison

5   would get paid again.

6   Q.  Did you ask Mr. Al-Jumail if he knew that paying liaisons

7   and switching patients was illegal?

8   A.  Yes.  Mr. Al-Jumail admitted that paying liaisons and

9   patients and rotating patients back and forth between the, you

10  know, Associates and Swift that all of that was fraudulent.

11  Q.  And did you ask Mr. Al-Jumail whether Associates billed

12  for services that were not provided?

13  A.  Yes.  Mr. Al-Jumail explained that sometimes a patient

14  would only be seen once in a week but that they would be bill

15  for two visits and that the paperwork kept by the nurses and/or

16  therapist was not always perfect.

17              MR. HURFORD: No further questions, your Honor.

18              THE COURT:   All right.  Thank you.

19              Mr. Ayad, do you wish to question this witness?

20              MR. AYAD: Yes, your Honor.  Thank you.

21              THE COURT:   You may.

22                          CROSS-EXAMINATION

23  BY MR. AYAD:

24  Q.  Good afternoon, Agent Elverson?

25  A.  Good afternoon.

1    Q.   Agent, in May of 2012 how long have you been employed with

2    the FBI?

3    A.   In May of 2012 that would be approximately two years.

4    Q.   Actually, is it under two years?

5    A.   Yes.

6    Q.   So under two years at the time that you conducted the

7    interview of this defendant, Mr. Al-Jumail, correct?

8    A.   That is correct.

9    Q.   And before that you worked as an engineer, correct?

10   A.   That's correct.

11   Q.   You had no prior law enforcement training before your time

12   at the FBI; isn't that correct?

13   A.   That's correct.

14   Q.   You were never educated in law enforcement before your

15   time at the FBI; isn't that correct?

16   A.   That is correct.

17   Q.   So here you are on May 2nd of 2012, correct, questioning

18   an individual that you have under literally two years of

19   experience in law enforcement, in this case the FBI, and you

20   are not an agent in the investigation; isn't that correct?

21   A.   That is correct.

22   Q.   Okay.

23             So you really didn't know the details of this

24   investigation, did you?

25   A.   Only just a brief synopsis that I received in a brief.

1    Q.   And that was a one time brief synopsis before you

2    interviewed him?

3    A.   One, possibly two short briefs.

4    Q.   Okay.

5         Did you ask Mr. Al-Jumail certain questions

6    related to whether he is of a sound mind, basically, to answer

7    your questions?

8    A.   I don't remember asking a question along those lines.

9    Q.   Okay.  Now can you tell me, please, what time did you

10   arrest Mr. Al-Jumail?

11   A.   Approximately 6:30 in the morning.

12   Q.   Six thirty in the morning.

13        Did you ask Mr. Al-Jumail what time he went to bed

14   that evening?

15   A.   Not to my recollection, sir.

16   Q.   Did you know if he went to bed that evening?

17   A.   Possibly not.

18   Q.   Okay.

19        Did you ask Mr. Al-Jumail if he's under any kind

20   of influence such as alcohol or prescription drugs of any sort?

21   A.   Well, we did talk about it a little bit because, you know,

22   we asked him about medication and that's when he told us about

23   his blood pressure medication which is why we made sure he

24   brought it along with him when we took him to the office.

25   Q.   Okay.

1          So he told you he was under blood pressure

2     medication, correct?

3     A.   Correct.

4     Q.   In fact, didn't he take a blood pressure medication pill?

5     A.   Yes, he did.

6     Q.   Okay.

7          And did you ask him specifically, though, as to

8     whether he's under the influence of alcohol for instances?

9     A.   I don't remember, but I would, it would only be a guess

10    that we would discuss it, given he was about to take

11    medication.

12    Q.   You said you don't remember.  Would you like me to refresh

13    your memory?

14         We have your statement right here, would you like

15    to look at that?

16    A.   I don't believe there's anything about, specifically about

17    alcohol in that report.

18    Q.   So, it would be fair to say that you didn't question him

19    about whether he's under the influence of alcohol?

20    A.   I wouldn't say it wouldn't fair.  I just don't remember.

21    Q.   But if I tell you in your statement there's nothing

22    relating to you questioning him about alcohol, would I be

23    incorrect?

24    A.   Would you be incorrect?

25    Q.   Yes.

```
1    A.   No.
2    Q.   Okay.
3              And you never asked him how long he was up that
4    evening?
5    A.   Not that I remember, no.
6    Q.   Okay.
7              Did you ask him how far did he get in school by
8    any chance?
9    A.   I don't remember if we discussed how far he made it in
10   school.  I know we asked him if he was medically trained, which
11   he stated he was not.
12   Q.   Agent Elverson, it seems like you are having a problem
13   remembering.  Would it be safe to say, sir, that once you
14   question --
15              MR. HURFORD: Objection to the attorney
16   characterizing the defendant(sic) as having a difficult time
17   remembering.
18              THE COURT:   Sustained.  It does not appear that
19   he's having a problem, he said he's having a difficult time
20   remembering.  Rephrase your question.
21              MR. AYAD: All right.
22   Q.   (By Mr. Ayad, continuing)  Okay.  Would it be safe, Agent
23   Elverson, to say that any questions that you posed to him you
24   would have, and any answers that he gave you, would have been
25   on this sheet you wrote, your FBI 302's?
```

1    A.   Not necessarily.

2    Q.   Oh, so, there were would be certain statements that,

3    certain questions you would ask and certain statements, answers

4    he would give that you would not put on this FBI 302?

5    A.   Well, sometimes you may have more casual conversations,

6    you know, there was, between giving him a restroom break and

7    water, and all that, I'm sure we were not completely silent

8    during that time.  So things may have been stated that I did

9    not take notes of or write down because they didn't seem

10   pertinent.

11   Q.   Mr. Elverson, wouldn't you agree with me, sir, that

12   whether a witness can understand one's language to what is

13   written before him before he signs a document is important?

14   A.   Yes.

15   Q.   And wouldn't you want to ask him that question before you

16   have him sign the document?

17   A.   I don't know what question you're referring to.

18   Q.   I'm saying you had him sign on government's exhibit?

19             THE COURT:   One twenty-five.

20   Q.   (By Mr. Ayad, continuing) Exhibit 125, what's called the

21   advice of rights form; isn't that correct?

22   A.   That is correct.

23   Q.   And in that it says, "You have the right to remain

24   silent"; isn't that correct?

25   A.   It does say that, yes.

1  Q.  "You have the right to talk to a lawyer for advice before

2  we ask any questions", didn't you ask him that?

3  A.  I did.

4  Q.  Okay.

5          "You have a right to have a lawyer during

6  questioning"?

7  A.  Correct.

8  Q.  All right.

9          And these are written information and at the end

10  he has to consent by saying, at this time I'm willing to answer

11  questions without a lawyer present; isn't that correct?

12  A.  That is correct.

13  Q.  And he signs off on the consent form, basically, the

14  advice of rights form, correct?

15  A.  Correct.

16  Q.  All right.

17          Did you ask him whether he understood what he was

18  reading?

19  A.  I did.

20  Q.  You did?

21  A.  Yes.

22  Q.  Can you tell me why you wouldn't put it in your statement

23  that you asked him whether he understood what he was reading?

24  A.  Well, I believe I do make a statement to that effect.  I

25  think it's early on in the interview we read him the form; he

1    stated he understood the form, and he initialled and sign it.

2    Q.   Okay.

3         So your testimony, Agent Elverson, is that you

4    read it to him and he signed off on it?

5    A.   Ever time I've done an advice of rights form the form is

6    available for the individual to read; I also read it aloud to

7    the individual, and I ask them if they have any questions, if

8    they can understand it okay, and I would have provided it in

9    another language had he requested it.

10   Q.   Okay.

11        But again, you read it to him, and had it been

12   said that, you know, this is an agreement that you murdered an

13   individual and you said something different, he just signs off

14   to it, that would have been -- let me withdraw.

15        He didn't read this particular statement, did he?

16   A.   I believe he did read it.

17   Q.   You believe he read it.  But you don't know that because

18   you never ask him whether he knows how to read or not?

19   A.   I showed him the form to him and I asked him to read it

20   over.  I also read it to him and he initialed and signed that

21   he did in fact understand the form.

22   Q.   Okay.

23        But that's because you told him to read.  Did you

24   ask him the question, do you know how to read?

25   A.   I do not think that I asked him if he knew how to read.

1    Q.   And what time, again, was this, at 6:30 in the morning you

2    arrested him?

3    A.   We arrested him at 6:30 in the morning.

4    Q.   Now, being an FBI agent, Agent Elverson, were you trained

5    in taking evidence?

6    A.   I was, yes.

7    Q.   And you would consider Mr. Al-Jumail's statements to you

8    as evidence, isn't that kind of a form of evidence?

9    A.   I would consider it testimonial.

10   Q.   Testimonial evidence, correct?

11   A.   That sounds correct.

12   Q.   Okay.

13             And were you trained in videography as to the

14   ability to take video of a witness?

15   A.   I do not believe that was part of training.

16   Q.   Okay.

17             Were you trained in recording a witness's

18   statement, audio?

19   A.   No.

20   Q.   What I'm getting at, Mr., Agent Elverson, is that did you

21   feel what he said in here was important when he talked to you?

22   A.   I did, yes.

23   Q.   You did.

24             And why didn't you have him just sign, basically,

25   the bottom of the form that this is indeed what you said, Mr.

1    Al-Jumail?

2    A.   Well, first of all, that form as you see, it was not typed

3    up during the interview, so that wouldn't have been possible.

4    Q.   Okay.

5           Well, you wrote some information down when you

6    were taking this information, correct?

7    A.   I took notes, yes.

8    Q.   You took notes.

9           Couldn't you have said certain statements and at

10   the end of your, whatever, two-page, three-page, four-page

11   document have him sign it indeed this is my statement?

12   A.   That would have been possible, yes.

13   Q.   Yes.

14           In fact, you had him sign this advice of rights

15   form, did you not?

16   A.   Yes, I did.

17   Q.   So you were aware already that he could have said certain

18   statements and you had him sign on the bottom that indeed these

19   were, these are my statements, correct?

20   A.   I'm sorry.  What was the question?

21   Q.   You've had him sign an advice of rights before and the

22   advice of rights basic form, basically, says that I acknowledge

23   I understand this, correct?

24   A.   Yes.

25   Q.   Okay.  Why didn't you have him sign a statement saying

1    these are indeed my answers to your questions, Agent Elverson,

2    here is my signature to assure that that is my statement?

3    A.   That's just not a standard practice during an interview.

4    Q.   But you would agree with me that would have been a better

5    practice, would it not?

6    A.   I would not.

7              MR. HURFORD: Objection.  Relevance.

8              THE COURT:   It might be relevant.  Overruled.

9              THE WITNESS:   I would not necessarily agree with

10   you.

11   Q.   (By Mr. Ayad, continuing) You would not necessarily.

12   Okay.

13             Did you --

14             THE COURT:   Just one second.

15             Mr. Morton, would you go around to chambers.

16             MR. MORTON:  Sure.

17             THE COURT:   You may proceed.

18             MR. AYAD: Thank you, judge.

19   Q.   (By Mr. Ayad, continuing)   Did you have him initial by

20   his answers as this is indeed what you said?

21   A.   No, I did not.

22   Q.   So we're left, Agent Elverson, with your statement, law

23   enforcement's statement as to what this defendant said, isn't

24   that correct?

25   A.   Um, in the context of what we've discussed, yes.

1    Q.   Okay.

2              Did you ask Mr. Al-Jumail when he answered you as

3    to what his position, you said a manager, did you ask him, do

4    you know what a manager is?

5    A.   Actually, we discussed his role for some time.  It --

6    Q.   (By Mr. Ayad, continuing)   My question to you, Agent

7    Elverson --

8              THE COURT:   No.  Let him answer.

9              THE WITNESS:   It took a while of discussion to

10   essentially settle on an agreed term, that manager was the best

11   fit for his position.

12   Q.   (By Mr. Ayad, continuing)   So there was some discussion

13   about what is a manager, I mean, did you come up with that

14   term, "manager"?

15   A.   I really can't recall whether I came up with the term or

16   not.

17   Q.   So you really don't know?

18   A.   That's what I just said, yes.

19   Q.   And he described some of his duties, Agent Elverson?

20   A.   Yes, he did.

21   Q.   And he said some of his duties deal with patient issues?

22   A.   Correct.

23   Q.   Did he describe other duties he had?

24   A.   Yes, he did.

25   Q.   Did he talk to you about paying bills, writing checks,

1   paying bills?

2   A.   He did talk about writing checks.

3   Q.   Yeah.  Okay.

4          Did he talk to you about paying utility bills?

5   A.   No.

6   Q.   Did you ask him the question, what type of checks you

7   wrote?

8   A.   I don't know.

9   Q.   Did he indicate to you who owned swift?

10  A.   Yes, he did.

11  Q.   And who did he tell you owned Swift?

12  A.   Ryan Ali.

13  Q.   And did he tell who Ryan Ali bought it from?

14  A.   He stated he bought it from an individual named Sharma.

15  Q.   Correct.

16         And did he tell you who Associates was owned by?

17  A.   Yes, he did.

18  Q.   Who was that?

19  A.   Firas Alky.

20  Q.   Did he tell you who Alky bought it from?

21  A.   In his words an "Indian guy".

22  Q.   Did you think he was referring to Mr. Sharma?

23  A.   I did not know who Mr. Sharma was, so I did not know.

24  Q.   Okay.

25         He didn't tell you, I own Swift, did he?

1    A.    No.

2    Q.    He didn't tell you, I own Associates, did he?

3    A.    No.

4    Q.    He didn't tell you, I owned ABC, did he?

5    A.    No.

6    Q.    He didn't tell you, I own Accessible, did he?

7    A.    No.

8    Q.    And you also testified on direct, Agent Elverson, that Mr.

9    Al-Jumail basically was kind of handed over the duties while

10   Mr. Alky was out of town for a month or so; isn't that correct?

11   A.    Yes.  He stated he was placed in charge.

12   Q.    He was placed in charge while Alky was gone out of town;

13   isn't that correct?

14   A.    That's correct.

15   Q.    And in particular with those duties he would have to write

16   a number of checks; isn't that correct?

17   A.    That is correct.

18   Q.    And I would -- did you take that to mean that he would

19   have to pay the, write checks for the operation of the

20   business?

21   A.    It's possible.  I don't know.

22   Q.    Okay.

23         That would entail payroll, taxes, utilities,

24   employees, thing of that nature?

25   A.    I don't know what that would entail.

1   Q.   Did you ask him who all the liaisons were that you

2   testified on direct about?

3   A.   I don't believe we asked him all liaisons.  He did

4   mention, I believe, two specific liaisons.

5   Q.   Okay.

6            And he only mentioned two specific liaisons; isn't

7   that correct?

8   A.   That is correct.

9   Q.   Did you ask him, who are all the liaisons, list them for

10  me?  Did you ask him that question?

11  A.   I don't remember the way I worded the questions.

12  Q.   So you don't know?

13  A.   I don't know.

14  Q.   Did you even ask him whether he knew who all the liaisons

15  were?

16  A.   Again, I don't know how the question was asked.

17  Q.   You don't know?

18  A.   I don't know.

19  Q.   Did you ask him whether he wrote all the checks for all

20  the liaisons?

21  A.   Well, it was my understanding from his statement that

22  while Mr. Alky was out of town, yes, he wrote all the checks

23  for the liaisons.

24  Q.   What about when Mr. Alky wasn't out of town, did you ask

25  him that question, when Mr. Alky isn't out of town you don't

```
 1    take care of operations; did you write all the checks for all
 2    the liaisons?
 3    A.   He stated that Mr. Alky generally dealt with the liaisons.
 4    Q.   And that's my point.  It was Mr. Alky that generally dealt
 5    with the liaisons; isn't correct, Agent Elverson?
 6    A.   That's what he stated, yes.
 7    Q.   And Tony didn't tell you who got the liaisons, basically,
 8    who brought the liaisons in, did he tell you that?
 9    A.   What do mean by "who brought the liaison"?
10    Q.   Who brought, who hired the liaisons.  He didn't tell you
11    who hired the liaisons, did he?
12    A.   No, I don't think so.
13    Q.   You don't know if it was Alky that hired the liaisons, do
14    you?
15    A.   I don't know.
16    Q.   You don't know if it was Sharma who hired the liaisons, do
17    you?
18    A.   No.
19    Q.   And Tony Al-Jumail didn't tell you that he got the
20    patients for, for the liaisons, did he?
21    A.   No.
22    Q.   Now there was some testimony by government counsel on the
23    record, questioned you how much, if Tony knew how much
24    basically these liaisons were paid for each patient, do you
25    remember that?
```

```
 1    A.   I do remember that.

 2    Q.   And you said several hundred dollars for each patient?

 3    A.   That's correct.

 4    Q.   Isn't it true that he told you it was Alky that paid the

 5    several hundred dollars, not Tony, didn't he tell you that?

 6    A.   He explained that Alky generally dealt with liaisons and

 7    when Alky was out of town, Mr. Al-Jumail would pay the

 8    liaisons.

 9    Q.   Okay.

10              But he told you it was Alky that paid the several

11    hundred dollars, not himself?  He told you that?

12              MR. HURFORD: Objection.  Asked and answered.

13              MR. AYAD: That's not asked.

14              THE COURT:  It is asked and answer, but if you

15    want him to answer it again, I will allow it since it's --

16              MR. AYAD:  Well, my question --

17              THE COURT:  -- phrased slightly differently.

18              MR. AYAD: It's a specific question --

19              THE COURT:   Excuse me.

20              MR. AYAD:  I'm sorry, judge. I apologize.

21              THE COURT:   You may answer.

22              THE WITNESS:  Liaisons -- Mr. Al-Jumail stated

23    that liaisons were paid several hundred dollars.  My

24    understanding during the interview is that payment amount was

25    the same regardless if Mr. Al-Jumail was paying them or whether
```

1   Mr. Alky was paying them.

2   Q.   But my question, Agent Elverson, was he told you Alky paid

3   several hundred dollars?

4               THE COURT:   Now that question has been asked and

5   answered more than once.  Go to a new question, please.

6   Q.   (By Mr. Ayad, continuing)   And there was some questions

7   about recertification, do you remember that Agent Elverson?

8   A.   Yes.

9   Q.   All right.

10              And wasn't it your testimony, sir, that it was a

11  doctor, a doctor that actually does the recertification; isn't

12  that correct?

13  A.   Correct.

14  Q.   It wasn't Tony --

15              MR. HURFORD: Objection, your Honor.  It misstates

16  the testimony.  He testified as to what Mr. Al-Jumail said, not

17  as to what actually happened.

18              THE COURT:   For the record, rephrase your

19  question.

20  Q.   (By Mr. Ayad, continuing)   You were told that it was a

21  doctor that does the recertification; isn't that correct?

22  A.   That is correct.

23  Q.   It wasn't Tony that did the recertification, correct?

24  A.   Mr. Al-Jumail did not tell me that he did the

25  recertification.

```
1   Q.   Isn't it true, sir, that from speaking to Mr. Al-Jumail

2   you learned that initially he didn't know how much liaisons

3   were paid, initially?

4   A.   No, that's not correct.

5   Q.   Didn't you say in your statements that initially Mr.

6   Al-Jumail basically stated that he was unaware of how much

7   liaisons were paid?

8   A.   Initially in the interview he did state that he was

9   unaware, correct.

10  Q.   That's my question.  Initially he indicated he was

11  unaware, correct?

12  A.   Yes.  I just wasn't clear on your wording.

13  Q.   Okay.

14          And isn't it true from your discussions with Mr.

15  Al-Jumail you learned that Tony was being told what to do by

16  Alky?

17  A.   He did say that, yes.

18  Q.   And isn't it true that Tony denied that patients were paid

19  solely for their biographical information?

20  A.   That's correct.

21  Q.   And when they did go out, there was testimony -- I'm

22  sorry.  Strike that.

23          There was some testimony as to when there were

24  complaints about patients complaining that Tony will go out and

25  speak with them; isn't that correct?
```

1    A.   I don't believe I stated that he went out and spoke with

2    them.

3    Q.   Well, I'm sorry.  I don't mean to put words in your mouth.

4    Can you please tell me what you testified to?

5    A.   What I stated was that Mr. Al-Jumail explained that when

6    he would get to the office one of his duties was to respond to

7    patient complaints.

8    Q.   Patient complaints, correct?

9    A.   Correct.

10   Q.   And did he tell you that he was directed by Alky to do so?

11   A.   He stated that sometimes he would direct his staff to deal

12   with patient complaints and sometimes he would deal with

13   patients directly at the direction of Mr. Alky.

14   Q.   Okay.  But it was at the direction of Mr. Alky; is that

15   correct?

16   A.   For some patients.

17   Q.   Did you say, "some patients" in your statements?

18   A.   I believe -- I mean, you're looking at my statement, you

19   can recite it better than I can.

20            THE COURT:   That's not the answer.  Please just

21   answer the question.

22            THE WITNESS:   Okay.  He stated that he directed

23   staff to deal with some of the patients and he dealt directly

24   with some of the patients himself at the direction of Mr. Alky.

25   Q.   (By Mr. Ayad, continuing)  But you didn't say that in your

1   statement.  Would you like me to refresh your memory?

2   A.   Please.

3            MR. AYAD: Judge, may I approach the witness?

4            THE COURT:   You may.

5   Q.  (By Mr. Ayad, continuing)   Please read that top

6   paragraph, Agent Elverson?

7   A.   Would you like me to read the beginning of the paragraph?

8   It starts on the previous page.

9   Q.  You could, please, sir.  Just please don't read it out

10  loud.

11  A.   I'm sorry.  Don't read it out loud?

12           THE COURT:   Don't read it out loud. Just to

13  yourself.

14  Q.  (By Mr. Ayad, continuing) Don't read it out loud.

15  A.   Okay.

16           Okay.

17  Q.  Isn't it true, sir, that you said sometimes Al-Jumail

18  would deal with the patients himself as directed by Alky, not

19  deal with some of the patients; isn't that correct?

20  A.   That is correct.

21  Q.  And isn't it true that when you inquired as to whether a

22  patient is ever called about not receiving any money, do you

23  remember what Al-Jumail told you in response to that?

24  A.   He stated that he has never received a call with that

25  complaint.

1   Q.   Okay.

2           You never asked him -- I'm sorry.  You never asked

3   Mr. Al-Jumail as to who told you to write certain checks here

4   and there, any type particular checks, did you, sir?

5   A.   I don't remember asking him that particular question.

6   Q.   So you don't really know who directed him to write certain

7   checks to whatever, correct?

8           Again, my question is, you don't know the checks

9   that Mr. Al-Jumail wrote, who directed him to write those

10  checks?

11  A.   Well, he was placed in charge by Mr. Alky and he stated

12  that one of his duties of being in charge while Mr. Alky was

13  gone was to write checks to liaisons.

14  Q.   But you don't know if Mr. Alky instructed him to write

15  this check for this person, this check to that person, this

16  check to this entity, you don't know that, correct?

17  A.   I do not know that.

18          MR. AYAD: Nothing further, judge.  Thank you.

19          THE COURT:   Thank you.

20          Mr. Johnson, do you have questions for this

21  witness?

22          MR. JOHNSON: I don't, your Honor.

23          THE COURT:   Ms. Mannarino, do you have any

24  questions for this witness?

25          MS. MANNARINO: I do not.  Thank you.

1          THE COURT: Mr. Louisell?

2          MR. LOUISELL: Just two, your Honor.

3                    CROSS-EXAMINATION

4    BY MR. LOUISELL:

5    Q.   Good afternoon, Mr. Elverson.

6    A.   Good afternoon.

7    Q.   Mr. Elverson, when you were assigned to arrest Mr.

8    Al-Jumail, were you told what the overall investigation was?

9    A.   Usually before an arrest like this, there's a bit of an

10   overall brief the day before and then the morning after there's

11   a very short brief on specifications of the arrest.

12   Q.   And was it accurate that the overall investigation was an

13   investigation of --

14          MR. HURFORD: Objection.  Calls for hearsay, your

15   Honor, as to what was told to Mr., to this witness about an

16   investigation.

17          THE COURT:   That's sustained in the form you're

18   presenting it.  Rephrase the question if you'd like or go to a

19   new one.

20          MR. LOUISELL: Thank you, your Honor.

21   Q.   (By Mr. Louisell, continuing)  Did you know that you were

22   participating in an investigation of Sachin Sharma?

23   A.   I really can't remember at the time.  I would -- I really

24   can't remember for sure.

25          MR. LOUISELL: May I --

1   Q.   (By Mr. Louisell, continuing)  Would your statement or

2   your -- your report refresh your recollection?

3   A.   Um, would that be the report of the interview with Mr.

4   Al-Jumail?

5   Q.   Yes.

6   A.   I don't believe that it would.

7               MR. LOUISELL: May I show it to him, your Honor?

8               THE COURT:   Yes, you may.

9               MR. LOUISELL: Thank you.

10  Q.   (By Mr. Louisell, continuing) This is your report, is it

11  not, or a copy of your report?

12  A.   Yes.  Okay, yeah, in the case title it does mention it.

13  Q.   And in the case title does it mention that the

14  investigation was of a Sachin Sharma?

15  A.   It does, but can I make a note about this?

16  Q.   No.  I just want you to answer my question.

17  A.   Okay.

18  Q.   So it does mention that you were investigating Sachin

19  Sharma?

20  A.   The case title on this piece of paper does, correct.

21  Q.   And does that piece of paper indicate when that

22  investigation commenced?

23  A.   Yes, it does.

24  Q.   And what month and date, and year was that?

25              MR. HURFORD:  Objection, your Honor, if the

1    witness has personal knowledge as to when the investigation

2    commenced.  I think he testified, as its stands he's asking,

3    he's being asked what it says on a piece of paper that's not in

4    evidence.

5              THE COURT:   Rephrase your question.

6              MR. LOUISELL: Thank you, your Honor.

7              THE COURT:   That's sustained as to the form of

8    question as currently asked.

9    Q.   (By Mr. Louisell, continuing)  Did you prepare that

10   report?

11   A.   Yes.

12   Q.   Okay.

13             And in preparing that report did you place down a

14   date of what, when the overall investigation of Sachin Sharma

15   commenced?

16   A.   No.

17   Q.   Is there a date on that report?

18   A.   On this piece on paper?

19   Q.   Yes.

20             MR. HURFORD: Objection to any further questions

21   about the date of when the investigation commenced.

22             THE COURT:   Based on what?

23             MR. HURFORD: Based on the fact this witness said

24   he didn't place any date on there and again he doesn't have

25   knowledge as to when an investigation commenced.

1           THE COURT:   He doesn't appear to have any

2   personal knowledge about it, Mr. Louisell, would you like to

3   respond?

4           MR. LOUISELL: Yes, your Honor, I would.  It's a

5   mystery to me having seen the report and with knowing what's on

6   that report, and it's his report, it's a mystery to me how he

7   cannot recall or refresh his recollection --

8           MR. HURFORD: It sounds like an argument right now

9   instead of an evidentiary response.

10          THE COURT:   It does.  Whether or not it's a

11  mystery to you is argument.

12          MR. LOUISELL: Okay.  That's irrelevant.

13          Your Honor, I think he can refresh his

14  recollection.  I don't know that he read the entire report when

15  he answered that question.

16          THE COURT:   If you would like him to read the

17  whole report, then you can pose it again if you'd like.

18          MR. LOUISELL:  Okay.

19  Q.   (By Mr. Louisell, continuing)  Actually, to shorten this

20  up, I would like you to read just the writing before you get to

21  the report of the statement.

22          THE COURT:   Just walk up and show him where you'd

23  like him to read.

24          MR. LOUISELL: Thank you.

25          THE WITNESS:   Your Honor, would I be able to

1   explain --

2              THE COURT:  You might be able to do that.

3              Have you read it?

4              THE WITNESS:   I have read it, your Honor.

5              THE COURT:   You may pose a new question.

6              MR. LOUISELL: Okay.

7   Q.  (By Mr. Louisell, continuing)  Having read the report,

8   does that refresh your recollection as to when the

9   investigation of Sachin Sharma was initiated?

10  A.   It does not refresh my recollection, but can I read the

11  date on this piece of paper.

12  Q.  How did it get there?

13             THE COURT:   How did it get there.  You can ask

14  that.

15  Q.  (By Mr. Louisell, continuing)  How did that date get

16  there?

17  A.   Our file system placed the date on this version of this

18  form.

19  Q.  And do you know what that date is?

20             MR. HURFORD: Objection, your Honor.

21             THE COURT:   Sustained.

22             Go to a new question.

23             MR. LOUISELL: I have no further questions, your

24  Honor.

25             THE COURT:   Thank you, Mr. Louisell.

```
 1                    Do you have any redirect?

 2                    MR. HURFORD: I do, your Honor.

 3                    THE COURT:   You may.

 4                    MR. HURFORD: Thank you.

 5                    May we inquire as to whether there's an additional

 6    cross-examination?

 7                    THE COURT:   Yes, we can.

 8                    Do you have any additional cross-examination?

 9                    MR. AYAD: No, judge.

10                    MS. MANNARINO: I have nothing.

11                    THE COURT:   Mr. Johnson?

12                    MR. JOHNSON: Nothing, your Honor.

13                    THE COURT:   Very well.

14                    Please proceed.

15                         REDIRECT EXAMINATION

16    BY MR. HURFORD:

17    Q.   Do you remember whether or not you spoke English to Mr.

18    Al-Jumail?

19    A.   I do.  I spoke English to him.

20    Q.   And that was on May 2nd?

21    A.   Correct.

22    Q.   Did he appear to understand your questions?

23    A.   Yes, he did.

24    Q.   And his responses to you, were they in English?

25    A.   Yes, they were.
```

1    Q.   And did you understand what he was saying to you?

2    A.   Yes, I did.

3    Q.   Did he appear to have the ability to communicate in

4    English?

5    A.   Yes, he did.

6    Q.   Did he look drunk?

7    A.   No, he did not.

8    Q.   Did he look --

9              MR. AYAD: Judge, I would object to.

10             THE COURT:   What's your objection?

11             MR. AYAD: Just as to foundation of looking drunk.

12   What is looking drunk?

13             THE COURT:   You can ask him that later if you'd

14   like.

15             I'm sorry.  Did he look drunk?

16             THE WITNESS:   No, he did not, your Honor.

17   Q.   (By Mr. Hurford, continuing) Did he look to you that he

18   was in a state of mind where he was unable to understand what

19   was going on?

20   A.   No, he did not.

21   Q.   And did he, in fact, at some point in time ask to take

22   blood pressure medication?

23   A.   Yes.

24   Q.   You were asked a lot about what you do know and don't know

25   and do remember and don't remember.  Do you remember whether

1    Mr. Al-Jumail told you he paid liaisons for patients?

2    A.   Yes, I do.

3    Q.   Do you remember him telling you that he paid them with

4    checks?

5    A.   Yes.

6    Q.   Did you remember him telling you that he paid several

7    hundred dollars for patients, per patient for those liaisons?

8    A.   Correct.

9    Q.   And do you remember him telling you as we sit here today

10   that Associates billed for services that weren't provided?

11   A.   Yes.

12              MR. HURFORD: No further questions, your Honor.

13              MR. AYAD: Judge, if I may.

14              THE COURT:   You may ask additional questions, Mr.

15   Ayad.

16                      RECROSS-EXAMINATION

17   BY MR. AYAD:

18   Q.   Agent Elverson, do you know how many millions of people in

19   this country know how, can understand the language but cannot

20   read, do you know that number?

21   A.   I do not.

22   Q.   So, just by speaking the language you would agree with me

23   that doesn't mean necessarily he knows how to read, isn't that

24   a fair statement?

25   A.   That's fair.

1    Q.   Okay.

2              And what's looking drunk to you, Mr. Elverson,

3    Agent Elverson?

4    A.   In my experience looking drunk would be slurred speech,

5    bloodshot eyes, eyes not tracking an object very accurately,

6    possible difficulty standing, possible nausea.

7    Q.   But an individual's alcohol content can be very high and

8    yet still not have slurred speech; isn't that correct?

9    A.   I'm not an expert on alcohol levels.

10   Q.   That is correct.

11             And you're not an expert as to whether he's drunk

12   or not drunk; isn't that correct?

13   A.   That is correct.

14   Q.   And, again, we're going back to this particular statement.

15   You said that he told you he paid for the liaisons or didn't he

16   tell you that Alky told him to pay for the liaisons?

17   A.   I'm sorry.  Can you rephrase your question?

18   Q.   You indicated right now on redirect that, is that he paid

19   for liaisons.  Isn't it true that you stated that Alky paid

20   liaisons several hundred dollars for patients?

21   A.   I made three separate statements.  One was that Alky

22   generally paid liaisons; one was that the amount that liaisons

23   got paid was several hundred dollars, and the other was that

24   Mr. Al-Jumail paid liaisons when Mr. Alky was out of town.

25   Q.   But the second -- let's go to the second part of that out

```
 1    of the three things.  The second part you said there was
 2    several hundred dollars paid to liaisons.
 3                 Isn't it true that Tony Al-Jumail told you Alky
 4    paid liaisons several hundred dollars?
 5                 MR. HURFORD: This question has been asked and
 6    answered.
 7                 MR. AYAD: No.  He brought it back up, judge.
 8                 THE COURT:  I know, but it has been asked and
 9    answered.
10                 MR. AYAD: It's a comment on what he said.
11                 THE COURT:  Excuse me.
12                 MR. AYAD: I'm sorry.
13                 I was stopped before, judge, as to asking this
14    particular question because his objection asks the question and
15    then he doesn't want me to answer that.
16                 THE COURT:  Because it has been asked and
17    answered.  But you may ask it again.  Phrase your question.
18    Q.  (By Mr. Ayad, continuing)  Isn't it true that Mr.
19    Al-Jumail said Alky paid several hundred dollars, not him, Alky
20    paid several hundred dollars?
21    A.  What he stated was liaisons were paid several hundred
22    dollars.
23    Q.  Could I show you your document to refresh your memory,
24    sir?
25                 MR. AYAD:  Judge, may I approach the witness?
```

1        THE COURT:   You may.

2   Q.   (By Mr. Ayad, continuing) Agent Elverson, if you could

3   please look in the middle of that page, your statement.  Tell

4   me where he said he paid several hundred dollars for patient,

5   for liaisons?

6            Isn't it true, sir, that you wrote in that

7   document Alky paid liaisons several hundred dollars for a

8   patient; isn't that true?

9   A.   That is true.

10  Q.   So it wasn't Tony that told you he paid several hundred

11  dollars for all those patients, it was Alky, wasn't that true?

12            Wasn't that true?

13  A.   Can you ask the question again?

14            THE COURT:   Don't yell at the witness.  You may

15  pose the question again if you choose to.

16  Q.   (By Mr. Ayad, continuing)   Isn't it true that he told you

17  Alky --

18            THE COURT:   Excuse me.

19            MR. AYAD: I'm sorry, your Honor.

20            I mean, you know, we can stay here all day, judge.

21            THE COURT:   Excuse me.

22            MR. AYAD: Sorry, judge.

23            THE COURT:   You may pose your question again,

24  okay, but don't shout.

25            MR. AYAD: I'm sorry, judge.

```
 1   Q.   (By Mr. Ayad, continuing)   Isn't it true that he told you
 2   Alky --
 3                THE COURT:   He who?  He who?
 4   Q.   (By Mr. Ayad, continuing)   Alky --
 5                THE COURT:   No.
 6   Q.   (By Mr. Ayad, continuing) Mr. Al-Jumail told you that Alky
 7   paid several hundred dollars, not him, not Tony?
 8   A.   The first half of that is true, he didn't say anything
 9   about not him.
10   Q.   I don't understand your answer.
11   A.   You just said, did Mr. Al-Jumail tell you that Alky paid
12   liaisons several hundred dollars and not him.  He did not say
13   "and not him".
14   Q.   Okay.
15                But my question is, it was he told you that Alky
16   paid the several hundred dollars for patients, isn't that
17   correct, for liaisons for patients, correct?
18   A.   He stated that Mr. Alky paid liaisons several hundred
19   dollars.
20   Q.   That's correct.
21                My second question is he didn't tell you he paid
22   several hundred dollars for patients?
23   A.   He stated that he paid liaisons, he did not state the
24   specific dollar amount that he paid them.
25   Q.   Sir, you're talking about when Mr. Alky was out of town
```

1    for a month he would write the checks for liaisons and others;

2    isn't that correct?

3    A.   That is correct.

4    Q.   Thank you.

5              MR. AYAD: Nothing further, judge.

6              THE COURT:   Do you have anything further on the

7    defense side, Mr. Louisell?

8              MR. LOUISELL: No, your Honor.

9              THE COURT:   Mr. Johnson and Ms. Mannarino, do you

10   have anything else?

11             MS. MANNARINO: No.

12             MR. JOHNSON: No, your Honor.

13             THE COURT:   Very well.

14             Do you have any questions, Mr. Hurford?

15             MR. HURFORD: No, your Honor.

16             THE COURT:   You may step down, sir.  You may step

17   down.  You're excused.

18             Is he excused?

19             MR. HURFORD:  From my perspective, he is, your

20   Honor.

21             THE COURT:   Does anyone else think he is not

22   excused?

23             MR. AYAD: No objection.

24             THE COURT:   Very well.  You're excused.

25             THE WITNESS:   Thank you, your Honor.

```
 1              (At 2:19 p.m. witness excused)
 2              THE COURT:   I'm going to send the jury home.  I
 3    appreciate you being willing to stay until 2:30.  We're letting
 4    you out a little earlier than that, if that inconveniences
 5    anybody, I'm really sorry about it.
 6              Tomorrow you're coming back at 9 o'clock, right?
 7              THE JURY PANEL: Right.
 8              THE COURT:   Okay.  I appreciate it.
 9              Remember that you're not permitted to talk about
10    the case among yourselves or with anyone else, nor are you
11    allowed to use any social media to communicate anything about
12    the case or to do any research about the case or anyone
13    involved in the case, nor are you to go to any of the places
14    that are mentioned during the course of this proceeding.
15              And you need to leave your notebooks in the same
16    fashion that you've left them every other night and I'll see
17    you tomorrow morning.  Have a good evening.  Hopefully it won't
18    rain on us so much.
19         (At 2:20 p.m. jury excused)
20              THE COURT:   Okay.  Do you have anything else we
21    need to take up today?
22              MR. HURFORD: There is one, two issues, your Honor.
23              THE COURT:   You can all be seated.
24              MR. HURFORD: Jury instructions.  It was our
25    position that the TGW information did not constitute 404(b)
```

1    evidence, that it was inextricable intertwined.

2              Your Honor's ruling yesterday was based on 404(b).

3    That being the case, it's the government's position that 404(b)

4    instructions should be read to the jury both in close proximity

5    to that testimony and at the final jury instructions.  We

6    prepared a 404(b) instruction and provided to defense counsel.

7    Just raising the issues now.

8              THE COURT:   So you want it read when?

9              MR. HURFORD: Well, I'd like an agreed upon

10   instruction and I think it should be, my understanding of the

11   jury in the Sixth Circuit jury instructions essentially there's

12   an indication that says the 404(b) instruction should be read

13   in close proximity to the 404(b) testimony.  Again, it's our

14   position that 404(b) jury instruction is not necessary, but I'm

15   bringing it to the attention of the court now.

16             THE COURT:   Okay.

17             MR. HURFORD: And then if the court is inclined to

18   read that instruction, I'd asked based on Mr. Ayad's

19   cross-examination for the instruction to be read from his

20   instructions which were 8.08 and they're on page 59 of his

21   instructions about that.  The verdict is limited to the charges

22   against these defendants.  I'd just ask that if the 404(b)

23   instruction be read, that the court also read the 8.08

24   instruction as well.

25             THE COURT:   Okay.  Mr. Johnson -- does anyone on

1  the defense side want to be heard on that?

2         MR. AYAD: Judge, I'm sorry.  I'm a little

3  confused.  I thought we were dealing with 7.13 and, I guess, I

4  heard 8.08 was dealing with 404(b).

5         I'm sorry.  Is the government counsel saying that

6  he preferred that we address the reference to other individuals

7  not being charged, is that what we're talking about?  I'm

8  sorry.

9         MR. HURFORD: Yes.  There was a sidebar -- my

10  recollection there was a sidebar.  I objected to numerous

11  occasions when Mr. Ayad was asking the witness about who and,

12  who was and was not being charge in this case, and I asked that

13  the instruction be read at that time and the Court stated that

14  it would read the instruction when Mr. Ayad was done, when that

15  witness was done, and I failed to bring that to the Court's

16  attention.

17         THE COURT:  And I failed to remember it.

18         Do you have any objection to that being read at

19  this time as well as the 404(b) instruction?

20         MR. AYAD: No, judge.  We've done our own research

21  on it.  I mean, it's not a hundred percent as to what the

22  government's position is, but I feel it's enough for this honor

23  to rule on the government's position, so we will have no

24  objection to that.

25         THE COURT:  Okay.

1              Mr. Johnson?

2              MR. JOHNSON: Your Honor, I think this is probably

3    a beneficial addition.  I would like to consider the language

4    and perhaps tell the Court in the morning.

5              THE COURT: That's fine.

6              You're looking at 8.08 on page 59 of Mr. Ayad's

7    instructions, and what other instructions 7.13.

8              MR. JOHNSON: Yes, your Honor.

9              THE COURT:  It is?

10             MR. HURFORD: I think what Mr. Johnson is talking

11   about with respect to the language is 7.13 that's what the

12   government just prepared and presented to him.

13             Eight point oh eight, I believe, is taken

14   strictly, cut and pasted from pattern instructions.

15             THE COURT:  Okay.

16             MR. HURFORD:  Seven point one three, which is the

17   404(b) instruction is not a cut and paste instruction.  It's an

18   instruction that has, that has to be manipulated.

19             THE COURT:  Do you have another copy of it?

20             MR. HURFORD: Yes, I do have another copy.

21             THE COURT:  Because I'll have a copy of it,

22   because I don't currently have a copy of it; is that right?

23             MR. HURFORD: That's correct, your Honor.

24             THE COURT:  Thank you, Mr. Hurford.

25             Okay.  I'll take a look at it as well.

1          Anybody have any -- Mr. Hurford, do you have any

2     other issues?

3          MR. HURFORD: I have no other issues, your Honor.

4          THE COURT:   How about you, Mr. Louisell?

5          MR. LOUISELL: No, your Honor.

6          THE COURT:   And, Mr. Johnson, other than wanting

7     to review just 7.13?

8          MR. JOHNSON: No, your Honor.

9          THE COURT:   Okay.  If you don't like it and you

10    want to prepare a different one, you should present that to the

11    Court --

12         MR. JOHNSON: Understood.

13         THE COURT:   -- before we take up at 9 o'clock

14    tomorrow.

15         Mr. Ayad?

16         MR. AYAD: Nothing further, your Honor.

17         THE COURT:   Ms. Mannarino?

18         MS. MANNARINO: Not at this time.  I may have some

19    issues with 7.13.  I'd like to address it --

20         THE COURT:   You have this copy also?

21         MS. MANNARINO: I have this copy.  I'll discuss it

22    with Mr. Johnson.

23         THE COURT:   That would be good.

24         MR. HURFORD: For the record, your Honor, I believe

25    the next witnesses that will be called in this case are Barbara

1    Humes, Casandra Cochran, and Ayah Omar.

2              THE COURT:   How spell Omar's first name.

3              MR. HURFORD:  A-Y-A-H.

4              THE COURT:   And the last name is what again?

5              MR. HURFORD:  O-M-A-R.

6              THE COURT:  Okay.

7              MR HURFORD:  And I will send an e-mail to counsel

8    with respect to the new exhibits that we seek to admit during

9    the testimony of those witnesses.

10             THE COURT:   Okay.  By "new" you mean exhibits

11   that have not already been admitted in evidence.

12             MR. HURFORD: That's correct, your Honor.

13             THE COURT:   Okay.

14             MR. HURFORD: I also would say at this time that

15   the government, I can see the light at the end of the tunnel

16   with respect the government's case.

17             THE COURT: Okay.

18             MR. HURFORD:  And I've only received witness lists

19   from Mr. Louisell and Mr. Ayad.

20             I've received exhibits and exhibit lists from Mr.

21   Louisell and Mr. Ayad and no one else at this time.

22             And so I would ask for the same courtesy that we

23   have extended.

24             THE COURT:   Okay.  And where -- when do you think

25   you're going to conclude?

1          MR. HURFORD: I think it will be at the end of this

2    week, your Honor, based on the current pace.

3          THE COURT:   Okay.

4          Just in preparation, you should know that when the

5    government rests if anyone is going to put on evidence, I will

6    expect that we will proceed thereto barring any motions or

7    anything you want to bring.  But I will be expecting you not to

8    say, I don't have a witness ready to put on.

9          You kind of understand that, right?

10          MR. AYAD:  Yes, your Honor.

11          MR. LOUISELL: Yes, your Honor.

12          THE COURT:   Mr. Ayad, I'll make it a little bit

13    more plain.  At the end of these proceedings it is likely that

14    someone will bring a motion.

15          MR. AYAD:  Yes.

16          THE COURT:  After that motion has been heard and

17    potentially ruled on, I will expect, if we have time in that

18    day, to immediately proceed to any presentations by defense,

19    okay?

20          MR. AYAD: That's correct.

21          THE COURT:  I won't be expecting to have a

22    request, can we come back tomorrow, or can we have an

23    additional length of time, unless you have some surprise.

24          MR. AYAD: That's understood, judge.

25          THE COURT:  Everybody else understood that,

1    right?

2                    MR. LOUISELL: Yes, your Honor.

3                    THE COURT:   Okay.  Good.

4                    Anything else you want to take up Ms. Mannarino?

5                    MS. MANNARINO: Only I just want to make sure I

6    understand.  The government said new exhibits, something we

7    have not seen in our exhibit books?

8                    THE COURT:   No, we went over this yesterday.

9                    I asked them if they would tell you what exhibits

10   they were going to use.  They did not want to expose their

11   strategy of the case or their theory of the case, or some word

12   they used.  I'm sorry, I don't remember precisely.  And so I

13   asked them if they would tell you what new exhibits, meaning,

14   ones that had not been previously admitted into evidence.

15                   So, they have the authority to use whatever has

16   been already admitted with any upcoming witness.

17                   MS. MANNARINO: I understand that, but I just

18   thought I heard him say it was not something that we had been

19   previously provided.  I just wanted --

20                   THE COURT:   He did say "new", but I think he

21   meant things in the exhibit book not yet introduced into

22   evidence.

23                   But I shouldn't say that, because I don't know

24   that that's what you meant.

25                   MR. HURFORD: Your Honor interpreted my words

1    perfectly.

2                MR. MANNARINO: Thank you.  That'S all.

3                THE COURT:   Okay.  Anything else?

4                MR. HURFORD: No, your Honor.

5                THE COURT:   Okay.  I'll see you tomorrow morning.

6           (At 2:29 p.m. proceedings concluded)

7

8                   C E R T I F I C A T E

9           I, Merilyn J. Jones, Official Court Reporter of the

10   United States District Court, Eastern District of Michigan,

11   appointed pursuant to the provisions of Title 28, United States

12   Code, Section 753, do hereby certify that the foregoing pages

13   1-56, inclusive, comprise a full, true and correct transcript

14   taken in the matter of United States of America versus Abdul

15   Malik Al-Jumail D-3, Felicar Williams D-4, Jamella Al-Jumail

16   D-6 and Dr. Carey Vigor D-10, 12-cr-20272 on Tuesday, August

17   12, 2014.

18

19

20                         /s/Merilyn J. Jones
                           Merilyn J. Jones, CSR, RPR
21                         Federal Official Reporter
                           231 W. Lafayette Boulevard, Suite 123
22                         Detroit, Michigan  48226

23   Date: May 15, 2016

24

25